IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

KERSTIN LINDEMANN-MOSES,        )
                                )
            Plaintiff,           )
                                )
      v.                         )      1:20cv655
                                )
BARBARA JACKMON and              )
CHRISTOPHER ANDRE JACKMON,       )
                                )
            Defendants.          )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, Chief District Judge.

Before the court is *pro se* Defendant Barbara Jackmon's ("Jackmon") motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 5.) *Pro se* Plaintiff Kerstin Lindemann-Moses filed a response in opposition. (Docs. 7, 8.) For the reasons set forth below, Jackmon's motion to dismiss will be granted in part and denied in part.

I.   BACKGROUND

The allegations, taken in the light most favorable to Lindemann-Moses, show the following:

On January 20, 2016, Lindemann-Moses connected with Defendant Christopher Andre Jackmon ("CJ") through an online dating service and soon thereafter began a romantic relationship with him. (Doc. 1 ¶¶ 3–5.) At the time, CJ was incarcerated in a Federal Bureau of Prisons ("BOP") facility in South Carolina. (Id. ¶ 5.)

In February 2016, CJ told Lindemann-Moses about an investment

opportunity called Nationwide Legal Services ("Nationwide"). (Id. ¶ 6.) CJ told Lindemann-Moses that he was establishing Nationwide to provide legal services to inmates. (Id. ¶¶ 1, 6, 8.) To convince Lindemann-Moses that the opportunity was legitimate, CJ showed her documentation and a personal bank account statement indicating he held $900,000. (Id. ¶ 6.)

In March 2016, Lindemann-Moses began the process of selling an inherited property in Germany. (Id. ¶ 7.) At that time, based on CJ's representations that Nationwide presented a lucrative investment opportunity, Lindemann-Moses acquired $50,000 from the trustee of the inherited estate to secure her interest in Nationwide. (Id.) Between March 13, 2016, and July 2016, Lindemann-Moses transferred the $50,000 to CJ through Western Union wire transfers and wire transfers to a Wells Fargo bank account opened in the names of CJ and his mother, Defendant Jackmon ("the Wells Fargo account"). (Id. ¶¶ 7, 9.)

In May 2016, CJ informed Lindemann-Moses that he would be released from prison in late 2016 and that he had already acquired a business address for Nationwide. (Id. ¶ 10.)

In June 2016, after receiving a loan from her sister, Lindemann-Moses transferred $25,000 to CJ through the Wells Fargo account. (Id. ¶¶ 11, 12.) She sent an additional $25,000 to CJ through a Western Union wire transfer and a personal check. (Id. ¶ 12.)

In August 2016, Lindemann-Moses received $250,000 from the sale of the inherited estate. (Id. ¶¶ 13, 19.) In October 2016, CJ sent Lindemann-Moses instructions on how to send him additional money. (Id. ¶ 14.) On December 2, 2016, after CJ showed Lindemann-Moses another personal bank account statement indicating he held over $900,000, Lindemann-Moses transferred $100,000 to the Wells Fargo account. (Id. ¶ 15.)

Sometime at the end of 2016, at CJ's urging, Lindemann-Moses connected with Jackmon and they developed a personal friendship. (Id. ¶ 16.) They conversed several times a week for multiple hours. (Id.)

In March 2017, at CJ's direction, Lindemann-Moses sent an additional $5,500 to the Wells Fargo account. (Id. ¶ 18.)

Sometime after July 2017 — after Lindemann-Moses had transferred all of her $250,000 inheritance to CJ — CJ ended his romantic relationship with her. (Id. ¶ 19.) Lindemann-Moses continued speaking regularly with Jackmon, who encouraged Lindemann-Moses to stay in contact with her son. (Id.)

Sometime after April 2018, Lindemann-Moses was contacted by G. Montague. (Id. ¶ 22.) Montague was an inmate who had been defrauded by CJ for $3,000. (Id.) In order to protect CJ and her investment in Nationwide, Lindemann-Moses paid Montague $3,000 to settle the debt. (Id.) At that point, Lindemann-Moses learned

3

that CJ had a long history of defrauding individuals and not preparing legal documents as promised. (Id.)

In March 2019, Lindemann-Moses visited CJ in a BOP facility in Brooklyn. (Id. ¶ 24.) During that visit, she asked CJ about the money she had given him. (Id.) He laughed and replied, "It was all gone." (Id.)

From March 2019 to August 2019, Lindemann-Moses began investigating CJ and reaching out to Jackmon regarding her lost money. (Id. ¶ 25.) Lindemann-Moses warned Jackmon that she would notify the BOP of CJ's fraud if he didn't return the money. (Id.) Jackmon offered Lindemann-Moses a sum of money if she agreed to refrain from reporting CJ's fraud until after he was released from prison. (Id.) In line with this agreement, Jackmon immediately paid Lindemann-Moses $5,000 and continued paying Lindemann-Moses $1,000 per month until CJ's release in November 2019. (Id.)

Upon CJ's release in November 2019, Lindemann-Moses picked him up from prison and transported him to Jackmon's home in Virginia for a release party. (Id. ¶ 26.)

By January 2020, Lindemann-Moses realized that CJ never intended to establish Nationwide and that he had defrauded her of her inheritance. (Id. ¶ 27.) Lindemann-Moses continued trying to recover her lost inheritance from CJ. (Id.) She appealed to Jackmon, giving her and CJ a deadline by which to return her money. (Id. ¶¶ 27, 29.) Jackmon became irate and frustrated with

4

Lindemann-Moses's appeals and left Lindemann-Moses several angry and threatening voicemails. (Id. ¶ 29.) In one message, Jackmon stated, "[Y]ou better watch what you say to me! I don't have anything to do with this [expletive]! This is between you and my son, Chris! So, don't call me again!" (Id.)

Through her efforts, Lindemann-Moses was able to recover some of her inheritance. On January 13, 2020, Lindemann-Moses received a Wells Fargo bank check for the sum of $20,000. (Id. ¶ 31.) On March 6, 2020, she received a second $20,000 Wells Fargo bank check. (Id.) On May 28, 2020, CJ paid Lindemann-Moses $50,000 in exchange for her signing an NDA that released and forgave any claims she held against CJ. (Id. ¶ 33; Doc. 9-7.) In total, Lindemann-Moses has recovered $90,000 of her $250,000 inheritance.[1] (Doc. 1 ¶ 35.)

Lindemann-Moses now brings claims against both CJ and Jackmon for breach of contract, fraud, intentional infliction of emotional distress, interference with expectation of inheritance, and unjust enrichment.[2] (Id. ¶¶ 36–63.) Lindemann-Moses argues that Jackmon conspired with CJ in the fraudulent scheme and that Jackmon, being

---

[1] If the parties include the $5,000 one-time payment and $1,000 monthly payments that Jackmon made to Lindemann-Moses between May 2019 and November 2019, the total recovered is closer to $100,000. (See Doc. 1 ¶ 25.)

[2] The parties agree that North Carolina law governs these claims. (See Doc. 1 (citing North Carolina law); Doc. 5 (same).) For purposes of the present motion, the court accepts the application of North Carolina law.

5

named on the Wells Fargo account with CJ, is liable because she had full control of the stolen money. (Id. ¶ 34.)

## II. ANALYSIS

### A. Standard of Review

Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. (8)(a)(2). Under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In considering a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the plaintiff's favor. Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). "Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegation 'to raise a right to relief above the speculative level' so as to 'nudge[] the[] claims across the line from conceivable to plausible.'" Sauers v. Winston-Salem/Forsyth Cty. Bd. Of Educ., 179 F. Supp. 3d

6

544, 550 (M.D.N.C. 2016) (alteration in original) (quoting Twombly, 550 U.S. at 555). "[T]he complaint must 'state[] a plausible claim for relief' that permit[s] the court to infer more than the mere possibility of misconduct based upon 'its judicial experience and common sense.'" Coleman v. Md. Ct. App., 626 F.3d 187, 190 (4th Cir. 2010) (alterations in original) (quoting Iqbal, 556 U.S. at 679). Thus, mere legal conclusions are not accepted as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

As noted, both parties proceed *pro se*. Although courts must construe *pro se* complaints liberally, "generosity is not a fantasy." Bender v. Suburban Hosp., Inc., 159 F.3d 186, 192 (4th Cir. 1998). The court is not expected to plead a plaintiff's claim for her, id., or "construct full blown claims from sentence fragments," Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985). Likewise, a court should not "conjure up questions never squarely presented." Id.

### B. Breach of Contract

Lindeman-Moses's first cause of action alleges breach of contract. Under North Carolina law, the essential elements for a breach of contract claim are the existence of a valid contract and a breach of the terms of that contract. Eli Rsch., Inc. v. United Commc'ns Grp., LLC, 312 F. Supp. 2d 748, 755 (M.D.N.C. 2004)

7

(citing Poor v. Hill, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000)). A valid contract requires an agreement based on a meeting of the minds and sufficient consideration. Creech ex rel. Creech v. Melnik, 556 S.E.2d 587, 591-92 (N.C. Ct. App. 2001). "[A] contract cannot bind a nonparty." E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 294 (2002); see Arthur Anderson LLP v. Carlisle, 556 U.S. 624, 632 (2009). Thus, in general, parties to a contract "cannot maintain an action" against nonparties based on the contract. Vitale & Assocs., LLC v. Lowden, 690 Fed. App'x 555, 556-57 (9th Cir. 2017) (per curiam); see Richmond Health Facilities v. Nichols, 811 F.3d 192, 200-01 (6th Cir. 2016); Ferrante v. Westin St. John Hotel Co., No. 4:18-CV-108-D, 2020 WL 486198, at *6 (E.D.N.C. Jan. 29, 2020).

Jackmon argues that this claim should be dismissed because Lindemann-Moses has failed to allege any contractual agreement with Jackmon. (Doc. 5 ¶ 1.) The court agrees. Lindemann-Moses has alleged that she had a verbal contract with both Defendants to become an equal partner in Nationwide alongside CJ. (Doc. 1 ¶ 37.) However, Lindemann-Moses has failed to allege any facts indicating that Jackmon was a party to this agreement. Taking the pleadings as true, CJ — not Jackmon — made the verbal agreement at issue. Lindemann-Moses fails to identify any agreement with Jackmon. Although Lindemann-Moses argues that the investment itself is evidence of an agreement between them (see Doc. 7 ¶ 1), the

8

transfer of funds to an account in CJ's name is consistent with the contractual agreement with him and does not necessitate an agreement with Jackmon.  The mere transfer of funds to an account held jointly by CJ and Jackmon does not serve to bind Jackmon to an agreement made by CJ.  As Lindemann-Moses has failed to allege a contractual agreement between herself and Jackmon, her claim for breach of contract against Jackmon will be dismissed.

### C. Fraud

Lindemann-Moses's second cause of action alleges fraud.  Jackmon argues that the fraud claim against her should be dismissed because Lindemann-Moses has not pleaded fraud with the required particularity.

Federal Rule of Civil Procedure 9(b) creates a heightened pleading standard for claims brought in federal court based on fraud or mistake, including state law claims.[3]  Topshelf Mgmt., Inc. v. Campbell-Ewald Co., 117 F. Supp. 3d 722, 725–26 (M.D.N.C. 2015).  Under this rule, parties alleging fraud "must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  Parties must plead with particularity "the time, place, and contents of the

---

[3] Although Lindemann-Moses is proceeding *pro se* and her pleadings are held to a less stringent standard than for those drafted by attorneys, she is held to compliance with the Federal Rules of Civil Procedure. Emiabata v. BB&T, No. 1:17CV529, 2018 WL 704714, at *2 (M.D.N.C. Feb. 1, 2018).

9

false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 379 (4th Cir. 2008) (citing Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999)). "[W]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." Andrews v. Fitzgerald, 823 F. Supp. 356, 373 (M.D.N.C. 1993) (quoting Di Vittorio v. Equidyne Extractive Indus., 822 F.2d 1242, 1247 (2d Cir. 1987)). The purpose of this heightened pleading requirement is to satisfy the court "(1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." Harrison, 176 F.3d at 784.

To state an actionable claim of fraud under North Carolina law, the following essential elements must be shown: (1) a false representation or concealment of a material fact, (2) that was reasonably calculated to deceive, (3) which was made with the intent to deceive, (4) that did in fact deceive, and (5) resulted in damage. Liner v. DiCresce, 905 F. Supp. 280, 288 (M.D.N.C. 1994) (citing Myers & Chapman, Inc. v. Thomas G. Evans, Inc., 374 S.E.2d 385 (N.C. 1988)).

Here, Lindemann-Moses has not alleged any misrepresentation

10

or concealment on Jackmon's part that caused her to invest her inheritance in Nationwide. She bases her fraud claim solely on misrepresentations made by CJ. (See Doc. 1 ¶ 42 (alleging "Defendants" committed fraud by falsely claiming to have started a company and providing false information and documentation to that end); see also id. ¶ 6 ("CJ told Moses about an investment idea."), ¶ 7 ("Moses while under [CJ's] web of deceit, asked neighbors, friends to send [money] to unknown associates of CJ."), ¶ 15 (explaining CJ showed her documentation that made her "feel safe her money was an investment"). As Lindemann-Moses has not alleged that Jackmon made any misrepresentations intended to deceive her, the pleadings are insufficient to state a claim for fraud against Jackmon.

The court recognizes that Lindemann-Moses may seek to hold Jackmon accountable for misrepresentations made by CJ based on a conspiracy theory. Specifically, Lindemann-Moses alleges that "CJ and Ms. Jackmon conspired against Moses to" defraud her of her inheritance and describes Ms. Jackmon as "his co-conspirator." (Doc. 1 ¶¶ 34, 35; see also Doc. 7 ¶ 2 (describing CJ and Ms. Jackmon as "acting in . . . concert" to perpetrate the fraud).) Cognizant of Lindemann-Moses *pro se* status, the court construes the complaint as alleging a claim for conspiracy to defraud against Ms. Jackmon. As such, the court will consider whether Lindemann-Moses has sufficiently stated such a claim.

11

A claim for conspiracy to defraud requires a successful underlying claim for fraud. Jay Grp., Ltd. v. Glasgow, 534 S.E.2d 233, 236 (N.C. Ct. App. 2000). In order to allege a conspiracy to defraud, "the particularity requirements of Fed. R. Civ. P. 9(b) must be met." First Fin. Sav. Bank, Inc. v. Am. Bankers Ins. Co. of Fla., No. 88-148-CIV-5-H, 1990 WL 260541, at *8 (E.D.N.C. July 5, 1990) (quoting Hayduk v. Lanna, 775 F.2d 441, 443 (1st Cir. 1985)). A complainant must state more than mere legal conclusions regarding the existence of the conspiracy. Id. A plaintiff must expressly allege an agreement or make averments of "communication, consultation, cooperation, or command" from which such an agreement can be inferred. Id. (citing Weathers v. Ebert, 505 F.2d 514, 517 (4th Cir. 1974)).

As a threshold matter, Lindemann-Moses has stated a claim for fraud against CJ. The court must therefore determine whether Lindemann-Moses has plausibly alleged facts to support a claim of conspiracy between CJ and Jackmon related to the underlying fraud.

While Lindemann-Moses does not expressly allege that Jackmon and CJ formed an agreement to defraud Lindemann-Moses, the complaint, construed liberally, contains sufficient factual allegations to plausibly support the inference of a conspiracy between Jackmon and CJ such that the claim survives a motion to dismiss. Specifically, the complaint alleges that Jackmon and CJ opened the joint Wells Fargo account to which Lindemann-Moses

12

deposited at least $130,000 between March 2016 and July 2017. As a named account holder, Jackmon either was or should have been aware of the large sums deposited into the account. Further, Lindemann-Moses claims that Jackmon had "full control of the stolen monies for close to [four] years," that she was the only person "with physical access to the Wells Fargo bank accounts," and that she "acted fully in securing and keeping control of the $250,000 while CJ was . . . in custody." Jackmon's involvement in the bank account, coupled with her knowledge of the large deposits into the account, is sufficiently indicative of some cooperation between Jackmon and CJ to infer — at least, at the present early stage — an agreement to defraud Lindemann-Moses through use of the account. Additionally, Jackmon's decision to pay Lindemann-Moses approximately $10,000 in hush money to keep her from reporting CJ to the BOP provides further indication of a conspiracy to defraud. Although Lindemann-Moses will ultimately need to provide additional facts in support of the alleged conspiracy, viewing the facts collectively and construing the complaint liberally, the allegations plausibly state a claim for conspiracy to defraud. As such, Jackmon's motion to dismiss the claim for conspiracy to defraud will be denied.[4]

---

[4] To the extent Lindemann-Moses intended to allege Jackmon aided and abetted CJ's fraud, that claim would fail under North Carolina law. "No North Carolina state court has recognized a claim for aiding and abetting fraud." Branch Banking & Trust Co. v. Lighthouse Fin. Corp., No. 04 CVS 1523, 2005 WL 1995410, slip op. at *8 (N.C. Super. Ct. July 13, 2005).

**D. Intentional Infliction of Emotional Distress**

Lindemann-Moses's third cause of action alleges intentional infliction of emotional distress. Jackmon also moves to dismiss this claim. (Doc. 5.) Under North Carolina law, the essential elements of this tort are "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress to another." Dickens v. Puryear, 276 S.E.2d 325, 335 (N.C. 1981); accord Simmons v. Chemol Corp., 528 S.E.2d 368, 371 (N.C. Ct. App. 2000). "Whether or not conduct constitutes extreme and outrageous behavior is initially a question of law for the court." Simmons, 528 S.E.2d at 372. "Conduct is extreme and outrageous when it is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Smith-Price v. Charter Behav. Health Sys., 595 S.E.2d 778, 782 (N.C. Ct. App. 2004) (internal quotation marks and citation omitted). The "extreme and outrageous" test accounts not only for the severity of a defendant's actions, but also "the severity of distress the defendant intended to instill in the victim by way of such actions." Tuggles v. United States, No. 1:18CV97, 2019 WL 954978, at *6 (M.D.N.C. Feb. 27, 2019) (quoting

---

See also Bradshaw v. Maiden, No. 14 CVS 14445, 2015 WL 4720387, at *14 (N.C. Super. Ct. Aug. 10, 2015); Yale v. CommunityOne Bank, N.A., No. 3:15-CV-403-RJC-DSC, 2016 WL 9753776, at *4 (W.D.N.C. Aug. 10, 2016).

14

Hensley v. Suttles, 167 F. Supp. 3d 753, 768–69 (W.D.N.C. 2016)). The behavior must be more than "mere insults, indignities, [or] threats . . . . [P]laintiffs must . . . be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate or unkind." Hogan v. Forsyth Country Club Co., 340 S.E.2d 116, 123 (N.C. Ct. App. 1986); see also McClean v. Duke Univ., 376 F. Supp. 3d 585, 612 (M.D.N.C. 2019).

Lindemann-Moses bases her claim for intentional infliction of the emotional distress, at least in part, on the fraud perpetrated on her. However, Lindemann-Moses has not alleged that the fraud was perpetrated with the intent of causing severe emotional distress. See Tuggles, 2019 WL 954978, at *7 (describing intent to cause distress as a "required element[] for an IIED claim"). The court is unaware of any case under North Carolina law where fraud or conspiracy to defraud, absent an alleged intent to cause emotional distress through that fraud, has been sufficient to support a claim of intentional infliction of emotional distress. Compare Leake v. Sunbelt Ltd. of Raleigh, 377 S.E.2d 285, 289 (N.C. Ct. App. 1989) (finding colorable claim of fraud is not sufficient to support intentional infliction of emotional distress claim because plaintiffs failed to show defendants "intended to cause emotional distress") with Johnson v. First Union Corp., 496 S.E.2d 1, 5 (N.C. Ct. App. 1998) (finding intentional infliction of emotional distress claim based on fraud survived dismissal because

15

plaintiffs alleged the misrepresentations and concealment "were done with the intent to inflict anxiety and distress"); see also Lord of Shalford v. Shelley's Jewelry, Inc., No. 199CV162, 2000 WL 33422738, at *6 (W.D.N.C. June 14, 2000) (holding allegations of breach of contract and fraud cannot be reasonably regarded as "extreme and outrageous" conduct intended to cause severe emotional distress). As Lindemann-Moses has not alleged that Jackmon perpetrated the fraud with the intention of causing her emotional distress, this conduct cannot serve as the basis for an intentional infliction of emotional distress claim.

Beyond the conspiracy to defraud, the only conduct upon which Lindemann-Moses bases her claim against Jackmon is "several contentious and assertive communications" between them. (Doc. 1 ¶¶ 29, 53.) Angry phone calls alone do not constitute extreme or outrageous conduct. See, e.g., Jolly v. Acad. Collection Serv., Inc., 400 F. Supp. 2d 851, 866–67 (M.D.N.C. 2005) (finding no extreme or outrageous conduct where defendant made multiple obnoxious phone calls in which he insulted and cursed at plaintiffs; concluding plaintiffs "were not physically threatened or intimidated in any way . . . . [Defendant] was not even present when the conversations occurred and plaintiffs were free to end the conversations at any time by simply hanging up the telephone"); Basnight v. Diamond Devs., Inc., 146 F. Supp. 2d 754, 767 (M.D.N.C. 2001) (finding inconvenient and impolite phone calls do not rise

16

to the level of extreme and outrageous conduct); <u>Daniel v. Carolina Sunrock Corp.</u>, 430 S.E.2d 306, 310 (N.C. Ct. App. 1993) (finding no extreme or outrageous conduct where, in addition to adverse employment actions, co-workers made "harassing phone calls to the home of plaintiff and to the homes of plaintiff's sister-in-law and mother"); <u>see also</u> <u>Johnson v. Bollinger</u>, 356 S.E.2d 378, 385 (N.C. Ct. App. 1987) (finding no extreme or outrageous conduct when an animal control officer confronted plaintiff in close physical proximity with cursing and angry threats, stating "I will get you," in the presence of a firearm). As Lindemann-Moses has failed to allege any extreme and outrageous conduct by Jackmon intended to cause her emotional distress, her intentional infliction of emotional distress claim will be dismissed.

**E.   Interference with Expectation of Inheritance**

The fourth cause of action alleges interference with expectation of inheritance, which is a class of undue influence. <u>See</u> <u>Stitz v. Smith</u>, 846 S.E.2d 771, 775 (N.C. Ct. App. 2020). Under this cause of action, a plaintiff can recover for malicious and wrongful interference with the making of a will. <u>Bohannon v. Wachovia Bank & Tr. Co.</u>, 188 S.E. 390, 394 (N.C. 1936).

Here, Lindemann-Moses does not claim that Jackmon interfered with the creation of the relevant will. Lindemann-Moses acknowledges that she received $250,000 pursuant to the sale of her inherited property. (<u>See</u> Doc. 1 ¶¶ 13, 19.) After receiving

17

her inheritance, she conveyed it to CJ. (Id.) As the will itself was not interfered with, this cause of action is not applicable. Lindemann-Moses's claim for interference with the expectation of inheritance will be dismissed.

**F. Unjust Enrichment**

The final cause of action alleges unjust enrichment. The elements of such a claim under North Carolina law are: "(1) plaintiff conferred a measurable benefit to defendant, (2) defendant knowingly and voluntarily accepted the benefit, and (3) the benefit was not given gratuitously." TSC Rsch. LLC v. Bayer Chems. Corp., 552 F. Supp. 2d 534, 540 (M.D.N.C. 2008). "[M]ore must be shown than that one party voluntarily benefited another or his property." JP Morgan Chase Bank, Nat'l Ass'n v. Browning, 750 S.E.2d 555, 560 (N.C. Ct. App. 2013). The doctrine of unjust enrichment applies in "circumstances where it would be unfair for the recipient to retain [benefits] without the contributor being repaid or compensated." Homeq v. Watkins, 572 S.E.2d 871, 873 (N.C. Ct. App. 2002) (quoting Collins v. Davis, 315 S.E.2d 759, 761 (N.C. Ct. App. 1984)). "In order to properly set out a claim for unjust enrichment, a plaintiff must allege that property or benefits were conferred on a defendant under circumstances which give rise to a legal or equitable obligation on the part of the defendant to account for the benefits received." Id. (quoting Norman v. Nash Johnson & Sons' Farms, Inc., 537 S.E.2d 248, 266

18

(N.C. Ct. App. 2000)). A successful unjust enrichment claim must show that, at the time a payment was made, both parties understood that the payment was made with an expectation of some service or benefit. Volumetrics Med. Imaging, Inc. v. ATL Ultrasound, Inc., 243 F. Supp. 2d 386, 412 (M.D.N.C. 2003) (citing Scott v. United Carolina Bank, 503 S.E.2d 149, 152 (N.C. Ct. App. 1998)). Further, no unjust enrichment occurs when the benefit is given without solicitation or inducement. See Homeq, 572 S.E.2d at 873.

Here, as Lindemann-Moses has sufficiently alleged Jackmon was involved in a conspiracy to defraud her, she has sufficiently alleged a claim for unjust enrichment against Jackmon. Lindemann-Moses conveyed at least $130,000 to CJ and Jackmon's joint bank account at the urging of Jackmon's alleged co-conspirator who induced Lindemann-Moses to convey the funds as an investment in a fictitious company. These facts are sufficient to indicate that Lindemann-Moses conveyed a measurable benefit to Jackmon, Jackmon was aware of the conveyance and accepted it voluntarily, and the benefit was not given gratuitously. As such, Jackmon's motion to dismiss this claim will be denied.

### III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Jackmon's motion to dismiss (Doc. 5) will be GRANTED IN PART and DENIED IN PART as follows: the motion to dismiss claims two (construed as a conspiracy to commit

19

fraud) and five (unjust enrichment) will be DENIED, and the motion to dismiss claims one (breach of contract), three (intentional infliction of emotional distress), and four (interference with inheritance) against Jackmon will be GRANTED and claims one, three, and four against Jackmon are DISMISSED.

      /s/   Thomas D. Schroeder
United States District Judge

October 16, 2020