IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

KERSTIN LINDEMANN-MOSES,          )
                                  )
          Plaintiff,              )
                                  )
     v.                           )          1:20cv655
                                  )
BARBARA JACKMON and               )
CHRISTOPHER JACKMON,              )
                                  )
          Defendants.             )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, Chief District Judge.

Before the court are three motions in which all parties appear pro se. Plaintiff Kerstin Lindemann-Moses moves for an entry of default (Doc. 42) and default judgment (Doc. 41) against Defendant Christopher Jackmon ("CJ"), who has responded in opposition (Doc. 44). Defendant Barbara Jackmon moves for summary judgment (Doc. 33), which Lindemann-Moses opposes (Doc. 40). For the reasons set forth below, Lindemann-Moses's motion for entry of default will be denied and her motion for default judgment dismissed as moot, and Barbara Jackmon's motion for summary judgment will be granted.

I.   **BACKGROUND**

The factual background of this case is extensively set out in this court's prior ruling on Defendant Barbara Jackmon's motion to dismiss for failure to state a claim, which this court granted in part and denied in part. See Lindemann-Moses v. Jackmon, No.

1:20CV655, 2020 WL 6120035, at *1 (M.D.N.C. Oct. 16, 2020). In short, as pertinent here, the facts establish the following:[1]

Lindemann-Moses met CJ in January 2016 through an online dating service and soon thereafter began a romantic relationship with him. (Doc. 1 ¶¶ 3-5.) At the time, CJ was incarcerated in a Federal Bureau of Prisons facility in South Carolina. (Id. ¶ 5.) In February 2016, CJ told Lindemann-Moses about a purported business venture, Nationwide Legal Services ("Nationwide"), that he presented as a lucrative investment opportunity. (Id. ¶ 6.) Soon thereafter, Lindemann-Moses began transferring money to CJ through wire transfers to a Wells Fargo bank account. (Id. ¶¶ 7, 9.) Toward the end of 2016, at CJ's urging, Lindemann-Moses developed a personal friendship with Barbara Jackmon, CJ's mother, often conversing several times a week for several hours. (Id. ¶ 16.) By sometime after July 2017, Lindemann-Moses had transferred roughly $250,000 to CJ in the belief she was investing in Nationwide. (Id. ¶ 19.)

In March 2019, Lindemann-Moses visited CJ in while imprisoned in Brooklyn and learned that the money she had given him was –

---

[1] As to Lindemann-Moses's motions related to default, the court can accept as true the well-pleaded factual allegations in the complaint as to liability." See Int'l Painters & Allied Trades Indus. Pension Fund v. Cap. Restoration & Painting Co., 919 F. Supp. 2d 680, 684 (D. Md. 2013) (citing Ryan v. Homecomings Fin. Network, 253 F.3d 778, 780-81 (4th Cir. 2001)). As to Barbara Jackmon's motion for summary judgment, the court views the facts in the light most favorable to Lindemann-Moses as the non-moving party. See Harris v. Pittman, 927 F.3d 266, 272 (4th Cir. 2019).

according to CJ - "all gone." (Id. ¶ 24.)  Lindemann-Moses began

investigating CJ and reached out to Barbara Jackmon regarding her

lost money.  (Id. ¶ 25.)  By January 2020, Lindemann-Moses began

recovery efforts: on January 13, 2020, she received a Wells Fargo

bank check for the sum of $20,000 (id. ¶ 31); she received a second

$20,000 Wells Fargo bank check on March 6, 2020 (id.); and on

May 18, 2020, CJ paid her $50,000 in exchange for her signing a

"Mutual and General Release of Claims" (the "Agreement") (id. ¶ 3;

Doc. 9-7; Doc. 33-3).  Importantly, the Agreement provided:

> WHEREAS Christopher Jackmon and Kerstin Moses were
> involved in an interpersonal relationship from 2016
> until 2020, and the parties acknowledge that Kerstin
> Moses caused certain dollar amounts to be transferred to
> accounts held in the name of Christopher Jackmon; And
> that Christopher Jackmon delivered a certain amount of
> money to Kerstin Moses; and the parties not wanting to
> engage in costly litigation to determine the
> characterization and amount of the money that was
> transferred to the other party.
>
> NOW THEREFORE for full and fair consideration, the
> receipt of which is hereby acknowledged by the parties
> hereto, the parties to [sic] agree as follows:
>
> 1.  Christopher Jackmon shall immediately pay to
>     Kerstin Moses the sum of $50,000.00 dollars; and
>
> 2.  Upon Kerstin Moses' receipt of the bank wire into
>     her account . . . in the above amount, the parties
>     shall execute a release of all claims; and
>
> 3.  All parties do release and forgive any and all
>     claims they have against each other, and against
>     any other parties regarding and/or in any way
>     arising out of the Litigation.  This is intended as
>     a mutual and general release of all claims between
>     the parties, their agents, successors, and
>     affiliates . . . .

3

(Doc. 33-3 at 2.)

Approximately two months later, on July 15, 2020, Lindemann-Moses filed the instant action asserting claims against both CJ and Barbara Jackmon for breach of contract, fraud, intentional infliction of emotional distress, interference with expectation of inheritance, and unjust enrichment. (Doc. 1.) Defendant Barbara Jackmon was served with the complaint and subsequently moved to dismiss. (Doc. 5.) This court granted the motion in part and dismissed all claims against her except for those alleging conspiracy to defraud and unjust enrichment. (Doc. 10 at 18-19.) Those were allowed to proceed based on Lindemann-Moses's allegation that she had "conveyed at least $130,000 to CJ and [Barbara] Jackmon's joint bank account at the urging of [Barbara] Jackmon's alleged co-conspirator who induced Lindemann-Moses to convey the funds as an investment in a fictitious company." (Id. at 19.)

On April 27, 2022, Barbara Jackmon filed a motion entitled "Emergency Response," in which she purported to respond to Lindemann-Moses's substantive allegations. (Doc. 33.) On June 16, 2022, the Magistrate Judge construed the filing as a motion for summary judgment, concluding that "it would be appropriate and helpful to consider [the issues raised in the motion] prior to proceeding to trial, particularly in light of the

4

parties' *pro se* status." (Doc. 38 at 3.) Shortly thereafter, Lindemann-Moses responded and moved for entry of default (Doc. 40), to which Barbara Jackmon replied (Doc. 43).

As it relates to the claims against CJ, the procedural history is more complicated. Despite numerous efforts, Lindemann-Moses had difficulty serving CJ with a summons and complaint. (Docs. 16, 17, 19, 20, 21, 22.) On the same day this court issued its memorandum opinion and order on Barbara Jackmon's motion to dismiss, it notified Lindemann-Moses that her failure to serve CJ might result in dismissal of the action against him without prejudice. (Doc. 11.) Finding that CJ could not be served "with due diligence . . . by personal delivery, registered or certified mail, or by a designed delivery service as authorized by 26 U.S.C. § 7502(f)(2)," the Magistrate Judge granted another extension and authorized Lindemann-Moses to serve CJ by publication within 60 days. (Doc. 22 at 7-8.) Within that time, Lindemann-Moses filed an "Affidavit of Due Diligence" averring that she had served CJ by publication in accordance with Federal Rule of Civil Procedure 4. (Doc. 23.) On August 5, 2022, CJ appeared in the action and responded in opposition to Lindeman-Moses's motions, seeking to raise the Agreement in defense of the complaint (Doc. 44), and Lindemann-Moses has filed a reply (Doc. 45).

The court turns first to Barbara Jackmon's motion for summary judgment, then addresses Lindemann-Moses's two default-related

motions.

## II. ANALYSIS

### A. Barbara Jackmon's Motion for Summary Judgment

#### 1. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Basnight v. Diamond Developers, Inc., 146 F. Supp. 2d 754, 760 (M.D.N.C. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In determining a motion for summary judgment, the court views the "evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences." Id. Summary judgment should be denied "unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." Guessford v. Pa. Nat'l Mut. Cas. Ins. Co., 983 F. Supp. 2d 652, 659 (M.D.N.C. 2013) (quoting Campbell v. Hewitt, Coleman & Assocs., Inc., 21 F.3d 52, 55 (4th Cir. 1994)).

While the movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact, once that burden has been met, the non-moving party must demonstrate the existence

6

of a genuine dispute of material fact.  Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 521 (4th Cir. 2003); Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  A mere scintilla of evidence is insufficient to circumvent summary judgment.  Anderson, 477 U.S. at 252; Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013) ("[T]he nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence."); see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (noting that there is an affirmative duty for "the trial judge to prevent factually unsupported claims and defenses from proceeding to trial" (citation omitted)).  Instead, the nonmoving party must convince the court that, upon the record taken as a whole, a rational trier of fact could find for the nonmoving party. Anderson, 477 U.S. at 248-49.  Trial is unnecessary if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question."  Mitchell v. Data General Corp., 12 F.3d 1310, 1315-16 (4th Cir. 1993).

As noted, all parties proceed pro se.  Although courts must construe pro se filings liberally, "generosity is not a fantasy." Bender v. Suburban Hosp., Inc., 159 F.3d 186, 192 (4th Cir. 1998). The court is not expected to advance a pro se litigant's claim or argument, id., or "construct full blown claims from sentence

7

fragments," <u>Beaudett v. City of Hampton</u>, 775 F.2d 1274, 1278 (4th Cir. 1985). Likewise, a court should not "conjure up questions never squarely presented," <u>id.</u>, or become an advocate for the pro se litigant, <u>Weller v. Dep't of Soc. Servs.</u>, 901 F.2d 387, 391 (4th Cir. 1990). However, where pro se parties clearly fail to adequately present arguments and applicable law to the court, the court has an independent obligation to ensure that it not be the unwitting participant in the continuation of claims that are clearly contrary to law. <u>Cf.</u> <u>Custer v. Pan Am. Life Ins. Co.</u>, 12 F.3d 410, 416 (4th Cir. 1993) (noting that the court cannot grant a motion for summary judgment merely because it is unopposed but rather must make an independent assessment whether the movant is "entitled to judgment as a matter of law"); <u>Gardendance, Inc. v. Woodstock Copperworks, Ltd.</u>, 230 F.R.D. 438, 448 (M.D.N.C. 2005) (same).

### 2. Motion for Summary Judgment

Barbara Jackmon contends that Lindemann-Moses's remaining claims are barred by the Agreement. (Doc. 43 at 6-7; Doc. 33-3.) Lindemann-Moses acknowledges having executed it (Doc. 1 ¶ 33) but argues it should not apply because CJ's investment scheme was a fraud. (Doc. 40 ¶¶ 24-29.)

#### a. Choice of Law

At the outset, the court must determine what law applies in construing the Agreement. Barbara Jackmon does not address this

8

question, and Lindemann-Moses cites to a North Carolina case (Doc. 40 ¶ 29), apparently in the belief that it applies.

Because this case is based on the court's diversity jurisdiction, North Carolina choice of law rules apply. See Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496 (1941); Colgan Air, Inc. v. Raytheon Aircraft Co., 507 F.3d 270, 275 (4th Cir. 2007) (per curiam). Here, the Agreement contains a choice of law provision which provides that the agreement was "made and entered into in the state of Virginia and shall be governed under the laws of said state." (Doc. 33-3 at 2.) Under North Carolina choice of law rules, "the interpretation of a contract is governed by the law of the place where the contract was made." Tanglewood Land Co. v. Byrd, 261 S.E.2d 655, 656 (N.C. 1980); Fried v. N. River Ins. Co., 710 F.2d 1022, 1024 (4th Cir. 1983). Moreover, there is a strong presumption that the parties' choice of law agreement will be given effect. Tanglewood Land Co., 261 S.E.2d at 656.

Only in "limited circumstances" will North Carolina courts ignore the parties' choice of law. Key Motorsports, Inc. v. Speedvision Network, L.L.C., 40 F. Supp. 2d 344, 346 (M.D.N.C. 1999). North Carolina follows the Restatement (Second) of Conflict of Laws. See Cable Tel Servs., Inc. v. Overland Contracting, Inc., 574 S.E.2d 31, 33 (N.C. Ct. App. 2002); Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc., 386 F.3d 581, 601-603 (4th Cir.

2004). Thus, the parties' choice will be respected unless: "(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue. . . ." Restatement (Second) of Conflict of Laws § 187(2) (Am. Law Inst. 1971).

Here, neither exception applies. When the Agreement was executed, CJ was living in Virginia. (Doc. 44 at 7; see also Doc. 33-3 at 2 (CJ signing the agreement in Newport News, Virginia).) In addition, the underlying conduct giving rise to the Agreement grew out of the transfer of money from Lindemann-Moses in North Carolina to CJ – who despite being imprisoned elsewhere at the time (see Doc. 1 ¶¶ 5, 17, 23) - was from Virginia and still had a Virginia address associated with each of the bank accounts to which Lindemann-Moses transferred money. (See Docs. 40-3, 40-4, 40-5, 40-6.) Finally, Barbara Jackmon, an alleged third-party beneficiary of the Agreement, lived in Virginia at the time of the events giving rise to the lawsuit, including the time CJ and Lindemann-Moses executed the Agreement. (Doc. 5-1 at; Doc. 18.) Accordingly, Virginia has sufficient connection to the parties and the issues in this case such that it meets North Carolina and the Restatement's reasonable basis and substantial relationship test.

10

Although Lindemann-Moses lives in North Carolina and transferred money to CJ from North Carolina, North Carolina's interest in the dispute is no greater than Virginia's. In addition, no party argues that the application of the choice of law provision would contravene the public policy of North Carolina. Nor has the court identified any aspect of Virginia law relevant to this case that would undermine the fundamental policy of North Carolina. See Troublefield v. AutoMoney, Inc., 876 S.E.2d 790, 800 (N.C. App. 2022) ("A choice of law provision, or any such agreement, is against public policy when it 'tend[s] to the violation of a statute'") (quoting Glover v. Rowan Mut. Fire Ins. Co., 45 S.E.2d 45, 47 (N.C. 1947)). Accordingly, the Agreement will be construed under Virginia law.

### b. Merits

Barbara Jackmon argues that Lindemann-Moses's claims should be dismissed because they were released by the Agreement, which she attaches to her motion. (Doc. 43 at 6-7.) Barbara Jackmon points to the Agreement's express waiver of "any claims that [Lindemann-Moses and CJ] may have against one another that arose during the relationship that began in 2016 and ended 2020" as well as "any and all claims they have against any other parties regarding and/or in any way arising out of the Litigation.'" (Doc. 43 at 6 (quoting Doc. 33-3) (emphasis added).)

Lindemann-Moses contends in conclusory fashion that the

11

"pretext and circumstances pertaining to this agreement render it null and void." (Doc. 40, ¶ 24.) She argues that the Agreement is "legally invalid and insufficient" because it purports to release CJ and Barbara Jackmon from liability for fraudulent behavior. (Id. ¶ 28.) She further contends that summary judgment is inappropriate because "the presentation of a signed release indemnification of claims arising out of a purported investment opportunity that actually turned out to be false and fictitious in its entirety is legally invalid and insufficient to indemnify the Defendant(s) of return the total amount of ($223,910.00) fraudulently obtained funds to the Plaintiff which is the basis of this litigation." (Id.; see also Doc. 40-1 ¶ 15 (contending that "the claims of summary judgment pursuant to a release that was obtained through the use of fraud should also be denied as the context of that agreement were not [sic] what they were made out to be to me at the time of the agreement," noting that "[t]here was never an investment/business opportunity that went wrong; Defendant Christopher Andre Jackmon had intended to defraud me from the start").)

Under Virginia law, "the scope and meaning of a release agreement ordinarily is governed by the intention of the parties as expressed in the document they have executed." Berczek v. Erie Ins. Grp., 529 S.E.2d 89, 91 (Va. 2000) (citing Richfood, Inc. v. Jennings, 499 S.E.2d 272, 275 (Va. 1998)). When the release

12

language is lawful and unambiguous, the agreement will be enforced as written. Id.; see also Artistic Stone Crafters v. Safeco Ins. Co., 726 F. Supp. 2d 595, 601–02 (E.D. Va. 2010). "'An ambiguity exists when language admits of being understood in more than one way or refers to two or more things at the same time.'" Golding v. Floyd, 539 S.E.2d 735, 737 (Va. 2001) (quoting Anos v. Coffey, 320 S.E.2d 335, 337 (Va. 1984)).

Here, the plain language of the Agreement expressly declares that Lindemann-Moses released "any and all claims" that she had against CJ or "any other parties regarding and/or in any way arising out of" her dispute over the money she transferred to CJ from 2016 to 2020. (Doc. 33-3 at 2.) The reference to "the Litigation" does not render the Agreement ambiguous, as it could not be referring to anything other than the events giving rise to this lawsuit. The intent of the parties is clearer still, considering the text of the Agreement in its entirety. See Babcock & Wilcox Co. v. Areva NP, Inc., 788 S.E.2d 237, 244 (Va. 2016) ("When considering the meaning of any part of a contract, we will construe the contract as a whole, striving not to place emphasis on isolated terms wrenched from the larger contractual context.") (citations and internal quotation marks omitted). Notably, the Agreement succinctly describes the background of the dispute ("Kerstin Moses caus[ing] certain dollar amounts to be transferred to accounts held in the name of Christopher Jackmon") and explains

13

that the parties entered into the Agreement to avoid "engag[ing] in costly litigation to determine the characterization and amount of the money that was transferred" from Lindemann-Moses to CJ. (Id.)  Finally, the Agreement is by its terms a "general release" to CJ and "any other part[y]" from "any and all claims" between Lindemann-Moses and CJ "have against each other," or "against any other parties regarding and/or in any way arising out of" this dispute.  (Doc. 33-3 at 2.)  "[T]he very nature of a general release is that the parties desire to settle all matters forever." Virginia Impression Prod. Co. v. SCM Corp., 448 F.2d 262, 265 (4th Cir. 1971) (citation and internal quotation marks omitted) (applying Virginia law in interpreting a general release agreement).  As such, a general release "not only settles enumerated specific differences, but claims of every kind or character, known and unknown." (Id.)  Lindemann-Moses's argument that the Agreement is not enforceable because it purports to release CJ and Barbara Jackmon from liability for fraud necessarily fails.  "Even fraud cases can be settled." Metrocall of Delaware, Inc. v. Cont'l Cellular Corp., 437 S.E.2d 189, 194 (Va. 1993).[2]

---

[2] While it is apparent that Lindemann-Moses's contention that she should be able to avoid the Agreement because CJ's venture was a fraud from the outset is insufficient to avoid the Agreement's release provisions, any suggestion that the Agreement is incomplete would be precluded by its express language, which provides: "The undersigned have carefully read this Release and fully understand all of its provisions.  This is the entire agreement between the parties." (Doc. 43-5 at 2.)  Moreover, any contention that she was misled into signing the Agreement because CJ "intentionally manipulated" her with a "'fake love' scam" (Doc. 40-1

14

A remaining question is whether Barbara Jackmon (who did not sign the Agreement) can enforce it as a third-party beneficiary. In short, the answer is yes. "An agreement will be enforced in favor of a third-party beneficiary when the beneficiary establishes that the parties to the agreement clearly and definitely intended to confer a benefit on the beneficiary." First Sec. Fed. Sav. Bank, Inc. v. McQuilken, 480 S.E.2d 485, 488 (Va. 1997) (citations omitted). Here, while the Agreement does not expressly mention Barbara Jackmon by name, read as a whole, see Babcock & Wilcox Co., 788 S.E.2d at 244, its terms clearly demonstrate she was an intended third-party beneficiary. See Kelley v. Griffin, 471 S.E.2d 475, 477 (Va. 1996) ("[A] third party who claims to be the beneficiary of a contract between others need not be named in the contract.") On this score, the Agreement

_____

¶¶ 15-16) would not be cognizable under Virginia law in so far as she executed the Agreement well after she claimed CJ had defrauded her. See Metrocall of Delaware, Inc. v. Cont'l Cellular Corp., 437 S.E.2d 189, 195 (Va. 1993) ("[W]hen negotiating or attempting to compromise an existing controversy over fraud . . . it is unreasonable to rely on the representations of the allegedly dishonest party."). To be sure, her accusations in this regard are at best conclusory. (See Doc. 40-1 ¶ 15 (stating that "the claims of summary judgment pursuant to a release that was obtained through the use of fraud should also be denied as the context of that agreement were not [sic] what they were made out to be to me at the time of the agreement"). Even where she offers such conclusory statements, they are predicated on her claim that CJ's investment scheme was the underlying fraud. See, e.g., Doc. 40 ¶ 25 ("Had there actually been an investment opportunity, then there could be arguments made with regard to the validity of this agreement."). So, even if such a claim were cognizable under Virginia law, such "conclusory statements unaccompanied by supporting facts in the record are insufficient to defeat a motion for summary judgment." Montgomery v. Risen, 197 F. Supp. 3d 219, 262 (D.D.C. 2016), aff'd, 875 F.3d 709 (D.C. Cir. 2017) (citations omitted).

includes two relevant provisions. First, it releases not only those claims that Lindemann-Moses and CJ have "against each other," but also those claims "they have . . . <u>against any other parties</u> regarding and/or arising" of the dispute. (Doc. 33-3 at 2.) And second, it states that it "is intended as a mutual and general release of all claims between the parties, their agents, successors, assigns, and affiliates." (<u>Id.</u>) Thus, the plain language of the Agreement establishes that the parties intended to confer a benefit on "any other parties" or "affiliates"[3] of either Lindemann-Moses or CJ who were involved in their dispute – which would include, of course, Barbara Jackmon. The benefit they sought to confer, moreover, was to release those individuals "from legal actions which . . . could have been brought against them prior to the execution of the agreement." <u>McQuilken</u>, 480 S.E.2d at 488. This is precisely the purpose of an express general release. <u>See, e.g.</u>, <u>Virginia Impression Prod. Co. v. SCM Corp.</u>, 448 F.2d 262, 265 (4th Cir. 1971) (stating, under Virginia law: "[T]he very nature of a general release is that the parties desire to settle all matters forever. A general release such as we have here not only settles enumerated specific differences, but claims of every kind or character, known and unknown.") (citation and

---

[3] <u>See</u> <u>Gammon v. GC Servs. Td. P'ship</u>, 27 F.3d 1254, 1257 (7th Cir. 1994) ("'Affiliate' is defined as 'signifying a condition of being united; being in close connection, allied, associated, or attached as a member or branch.'")(citing Black's Law Dictionary 58 (6th ed.1990)).

internal quotation marks omitted); <u>McQuilken,</u> 480 S.E.2d at 487 (stating that "[t]he scope of a release agreement, like the terms of any contract, is generally governed by the expressed intention of the parties," where the release agreement contained "unrestricted language releasing the employees of Mortgage Capital from 'any actions which arose prior to the date of the execution of this Agreement'"); <u>Dwyer v. Yurgaitis</u>, 294 S.E.2d 792, 794 (Va. 1982) ("As to the release form, it is a general release to Steward and 'all other persons' who may be claimed to be liable "from any and all claims" that may arise from the accident. . . . . Consequently, the release of Steward released all other tort feasors from liability for the same injuries, including [Defendant].").

Accordingly, Barbara Jackmon is a third-party-beneficiary of the Agreement, and each of Lindemann-Moses's remaining claims against her, which are derivative of those claims against CJ, are barred by it. Barbara Jackmon's motion for summary judgment will be granted.

## B. Lindemann-Moses's Motion for Entry of Default and Default Judgment

"Federal Rule of Civil Procedure 55 is the basic procedure to be followed when there is a default in the course of litigation." <u>Vt. Teddy Bear Co. v. 1-800 Beargram Co.</u>, 373 F.3d 241, 246 (2d Cir. 2004). Rule 55 outlines a "two-step process" for default

17

proceedings: first, the entry of a default pursuant to Rule 55(a), and second, the entry of a default judgment pursuant to Rule 55(b). VLM Food Trading Int'l, Inc. v. Illinois Trading Co., 811 F.3d 247, 255 (7th Cir. 2016); Canady v. Erbe Elektromedizin GmbH, 307 F. Supp. 2d 2, 9 (D.D.C. 2004).

Federal Rule of Civil Procedure 55(a) provides that the "clerk must enter" a party's default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." Although Rule 55 contemplates that the clerk enter default as a ministerial act, the district court also enjoys the inherent power to do so. See City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 128 (2d Cir. 2011). Once default is entered, the party may apply for a default judgment pursuant to Rule 55(b). If the "claim is for a sum certain or a sum that can be made certain by computation" and the other party "has been defaulted for not appearing and [] is neither a minor nor an incompetent person," the clerk is required to enter a judgment at the party's request. Fed. R. Civ. P. 55(b)(1). Otherwise, "the party must apply to the court for a default judgment" under Rule 55(b)(2). See Mystic Retreat Med Spa & Weight Loss Ctr. v. Ascentium Cap. LLC, No. 1:21-CV-00515, 2021 WL 4993088, at *1 (M.D.N.C. Oct. 27, 2021).

Here, Lindemann-Moses has satisfied the procedural

18

requirements of Rule 55 by submitting both a request for an entry of default and a motion for default judgment. (Docs. 41, 42.) See Capstone Cap. Grp., LLC v. Hahn, No. 21CV1636PGGKHP, 2022 WL 2532449, at *3 (S.D.N.Y. Mar. 15, 2022) (considering both the motion for entry of default and default judgment at once). However, before entry of default or default judgment may be entered, "service of process must be effective under the Federal Rules of Civil Procedure," Maryland State Firemen's Ass'n v. Chaves, 166 F.R.D. 353, 354 (D. Md. 1996), because "[a]bsent waiver or consent, a failure to obtain proper service on the defendant deprives the court of personal jurisdiction over the defendant." Koehler v. Dodwell, 152 F.3d 304, 306 (4th Cir. 1998).

### 1. Service of Process

Construed liberally, CJ's filing can be read to oppose entry of a default judgment because service of process was improper. (Doc. 44 at 3-4.) As explained by the Magistrate Judge's July 9, 2021 order, Federal Rule of Civil Procedure 4(e)(1) authorized Lindemann-Moses to serve CJ by publication pursuant to North Carolina law because she represented she could not with "due diligence" serve him "by personal delivery, registered or certified mail, or by a designated delivery service authorized by 26 U.S.C. § 7502(f)(2)." (Doc. 25 at 4-5 (discussing N.C. Gen. Stat. §1A-1, Rule 4(j1)).) Such service was proper so long as Lindemann-Moses complied with the provisions of N.C. Gen. Stat.

19

§ 1A-1, Rule 4.

CJ argues that Lindemann-Moses did not follow North Carolina law because she failed to publish notice of service in "an area where plaintiff believed defendant to be located" under Rule 4(j1). (See Doc. 44 at 3.)  According to CJ, Lindemann-Moses knew that he was "being released" to the James River Reentry Center in Newport News, Virginia, in December 2019, and she even visited him there twice in early 2020.  (See Doc. 44 at 3 ("Plaintiff drove down to see Defendant Christopher Jackmon, in [Newport News] in January and again in March 2020.").)  Despite this, he says, she served him by publication in Fairfax County, Virginia – some "140 miles" away.  (Id. at 7.)  Lindemann-Moses contends that Fairfax County was an appropriate place to serve process by publication because it was CJ's "last known address" and she could not, despite her best efforts, "locate" his "whereabouts."  (Doc. 23 at 5.)

Whether service of process was effective need not be resolved, because even if it were proper, the court would decline to enter default or default judgment for the reasons that follow.

First, CJ has willingly submitted to the jurisdiction of the court by asking for "permission to respond to Plaintiff's Claim" on the merits, and by requesting to raise an affirmative defense – i.e., the Agreement.  (Doc. 44 at 1, 4.)  In this respect, CJ's filing can be construed as waiving any objection to service.  See 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and

Procedure § 1390 (3d ed. 2004) (noting that generally Rules 12(g) and (h)(1) provide that the defense of insufficient service of process, among others, is waived by failing to assert it seasonably).  Courts have applied this rationale in the Rule 55 context when it is apparent that the defendant has, through his or her conduct, "submitted generally to the jurisdiction of the court."  O'Brien v. R.J. O'Brien & Assocs., Inc., 998 F.2d 1394, 1399 (7th Cir. 1993) (finding that the motion made pursuant to Rule 55 "was, in essence, a Rule 12 motion"); see also Am. Ass'n of Naturopathic Physicians v. Hayhurst, 227 F.3d 1104, 1107 (9th Cir. 2000) (observing that "[w]hen a party does not respond to a complaint and default judgment is entered, a Rule 55 motion will very frequently be the first document filed with the court," and explaining that Rule 12(h)'s waiver provisions were triggered because that filing raised other Rule 12(b)(2)-(5) defenses).

While "[d]etermining what constitutes waiver by conduct is more an art than a science . . . and there is no bright line rule," "it is relatively easier to find forfeiture of a service defense[,] as opposed to a personal-jurisdiction defense."  Boulger v. Woods, 917 F.3d 471, 477 (6th Cir. 2019) (citations and internal quotation marks omitted).  See also King v. Taylor, 694 F.3d 650, 659 (6th Cir. 2012) (noting "that service of process is simply the means by which a defendant receives notice of an action and is formally brought within a court's jurisdiction, whereas personal

21

jurisdiction concerns the fairness of requiring a defendant to appear and defend in a distant forum"); Datskow v. Teledyne, Inc., Cont'l Prod. Div., 899 F.2d 1298, 1303 (2d Cir. 1990)("[C]omplaining only about a defect in the form of service" is quite different from "contesting personal jurisdiction).

Considering "all of the relevant circumstances," Boulger, 917 F.3d at 477; Blankenship v. Bos. Globe Media Partners, LLC, No. 2:19-CV-00589, 2022 WL 329121, at *4 (S.D.W. Va. Feb. 2, 2022), waiver is proper here. The styling and substance of CJ's filing readily establish his obvious intent to submit to the personal jurisdiction of the court. Boulger, 917 F.3d at 477. The bulk of his filing is devoted to opposing default because he wishes to raise the Agreement as a bar to her claims. (Id. at 4-7.) Indeed, he specifically "seeks permission to respond" to the complaint because "the unambiguous language" of the Agreement allows him to prevail on the merits. (Id. at 7; see also id. at 1-2 (asking the court to "accept this pleading as defendant [sic] response to plaintiff [sic] complaint".) CJ's "actions demonstrate that he [seeks] to have the district court use its power over the parties to reach a decision on the merits, and require[s] the court to expend significant efforts in doing so." Boulger, 917 F.3d at 477-78 (citation omitted).

Second, "considerations of judicial economy weigh in favor of waiver in this instance." Edwards v. Clinical Sols., No.

22

919CV02872HMHMHC, 2020 WL 7249906, at *4 (D.S.C. Oct. 16, 2020), report and recommendation adopted, No. CV 9:19-2872-HMH-MHC, 2020 WL 6817090 (D.S.C. Nov. 20, 2020). Having made an appearance, CJ could easily be served with the complaint and summons were the court to deny the motion for entry of default on these grounds. This would be an unnecessary waste of resources and delay where, as here, CJ is on notice of the complaint and indicates a desire to respond with what the court has already found is a dispositive defense for Barbara Blackmon.

Accordingly, the court finds that CJ has waived objection to service and will proceed to the merits of Lindemann-Moses's motions.

### 2. Default Motions

Because an "entry of default under Rule 55(a) must precede grant of a default judgment under Rule 55(b)," <u>Johnson v. Dayton Elec. Mfg. Co.</u>, 140 F.3d 781, 783 (8th Cir. 1998), the court will first address Lindemann-Moses's motion for entry of default. (Doc. 42.)

The law generally disfavors resolution of claims by default. <u>Tazco, Inc. v. Dir., Office of Workers Comp. Program, U.S. Dep't of Labor</u>, 895 F.2d 949, 950 (4th Cir. 1990). Accordingly, "[a]ny doubts about whether relief should be granted should be resolved in favor of setting aside the default so the case may be heard on the merits." <u>USF Ins. Co. v. Bullins Painting, Inc.</u>, No.

23

1:11CV410, 2012 WL 4462004, at *1 (M.D.N.C. Sept. 25, 2012) (quoting Tolson v. Hodge, 411 F.2d 123, 130 (4th Cir. 1969)).

In this case, the court need not analyze whether entry of default pursuant to Rule 55(a) would be appropriate because – even assuming so - there would be "good cause" to vacate it under Rule 55(c).[4] See 10A Wright & Miller, supra, at § 2692 (4th ed. 2016) ("[W]hen deciding a motion for the entry of a default judgment, the court also often will consider whether sufficient grounds have been disclosed to justify vacating the default judgment upon a subsequent application under Rule 55(c). If the judgment would have to be vacated, the court may refuse to grant it initially."); Henry v. Metropolitan Life Ins. Co., 3 F.R.D. 142, 144 (W.D. Va. 1942) (noting that "[i]t would be a useless thing to enter the judgment as a matter of course and thereafter take up the question of whether having entered it the court should set it aside.") Although Rule 55 does define "good cause," the Fourth Circuit has advised district courts to consider: (1) whether the moving party

---

[4] To be sure, Rule 55(c) envisions a formal motion for relief. However, federal courts have traditionally "shown considerable leniency in treating other procedural steps as equivalent to [such] a motion" and will "often view opposition to a motion for the entry of a default judgment as a motion to set aside the default, whether or not a formal motion under Rule 55(c) has been made." 10A Wright & Miller, supra, at § 2692 (4th ed. 2016). In addition, district courts have the power to set aside an entry of default sua sponte. Thus, the lack of a formal motion is not fatal to CJ's requested relief. See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec, 529 F.3d 371, 386 (7th Cir. 2008) (stating that district courts have the authority sua sponte to set aside entry of default for good cause under Rule 55(c)).

24

has a meritorious defense, (2) whether he acts with reasonable promptness, (3) the personal responsibility of the defaulting party, (4) the prejudice to the party, (5) whether there is a history of dilatory action, and (6) the availability of sanctions less drastic. See Payne ex rel. Est. of Calzada v. Brake, 439 F.3d 198, 204-05 (4th Cir. 2006).[5] These factors are to be "liberally construed in order to provide relief from the onerous consequences of defaults and default judgments," Lolatchy v. Arthur Murray, Inc., 816 F.2d 951, 954 (4th Cir. 1987) (quoting Tolson, 411 F.2d at 130)), as the circuit court has "repeatedly expressed a strong preference that, as a general matter, defaults be avoided and that claims and defenses be disposed of on their merits." Colleton Preparatory Acad., Inc. v. Hoover Universal, Inc., 616 F.3d 413, 417 (4th Cir. 2010).

Here, CJ seeks to advance a meritorious defense – the existence of the release in the Agreement that would bar Lindemann-Moses's claims. (Doc. 44 at 4-7.) This suffices as a proffer that the merits outcome would be "contrary to the result achieved by the default," Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp., 843 F.2d 808, 812 (4th Cir. 1988) (internal citations omitted), and which would permit the court to find for him, United States v. Moradi, 673 F.2d 725, 727 (4th Cir. 1982).

---

[5] These are the same factors relevant to the question whether to enter default. Mystic Retreat, 2021 WL 4993088, at *3.

CJ need not establish a meritorious defense by a preponderance of the evidence. Terry v. Swift Trans., No. 1:16CV256, 2017 WL 4236923, at *3 (M.D.N.C. Sept. 22, 2017) (citing Cent. Operating Co. v. Util. Workers of Am., AFL-CIO, 491 F.2d 245, 252 n.8 (4th Cir. 1974)). See Mystic Retreat, 2021 WL 4993088, at *3 (finding this factor weighing against entry of default when defendant "allege[d] facts that provide for a meritorious defense"); United Sheet Metal, Inc. v. Fed. Ins. Co., No. PWG-13-3791, 2014 WL 1761122, at *3 (D. Md. Apr. 29, 2014) ("Mindful of this Court's general preference for deciding cases on the merits and that, in this case, Defendant has shown a meritorious defense, I will vacate the entry of default").

As to the second factor, whether a party has taken reasonably prompt action to set aside or avoid the entry of default, "must be gauged in light of the facts and circumstances of each occasion." Moradi, 673 F.2d at 727. "[T]his factor primarily considers the lapse in time between the entry of default, or discovery of such entry, and the moving party's efforts to set aside the entry of default." Artistic Stone Crafters, Inc. v. Safeco Ins. Co. of Am., No. 2:10CV45, 2010 WL 11700299, at *5 (E.D. Va. Apr. 15, 2010). Here, no default has been entered. And when Lindemann-Moses eventually moved the court to enter default (Doc. 42), CJ promptly responded three weeks later. (Doc. 44.) Thus, there was no delay once the motion for entry of default was discovered. Cf.

<u>Moradi</u>, 673 F.2d at 728 (reversing the district court's decision to deny relief from the default judgment, finding "that there was no delay here once the default was discovered.") This factor therefore weighs in favor of setting aside any entry of default that might occur.

Third, in determining the responsibility for the default, the Fourth Circuit focuses on the reason for the default. Where a party's own action or inaction is the source of the default, this factor weighs against setting aside entry of default. <u>Augusta Fiberglass</u>, 843 F.2d at 811. Here, there is no dispute that CJ, proceeding pro se throughout this litigation, is potentially responsible for the default. However, there is evidence that Lindemann-Moses had reason to know where to serve him. (Doc. 44 at 2-4.) While Barbara Jackmon retained counsel to write Lindemann-Moses to threaten that her lawsuit was in contravention of the Agreement, there is no indication that the attorney spoke for CJ. (Doc. 33-3 at 1.) As such, the third factor is a wash.

Fourth, in determining any prejudice to Lindemann-Moses if default were not entered, "delay in and of itself does not constitute prejudice to the opposing party." <u>Colleton Preparatory</u>, 616 F.3d at 418. "[N]o cognizable prejudice inheres in requiring a plaintiff to prove a defendant's liability, a burden every plaintiff assumes in every civil action filed in every federal court." <u>Id.</u> at 419. Courts instead consider whether

27

prejudice was incurred due to issues such as "[a] missing witness in the case whose testimony was made unavailable by the delay, ... any records made unavailable by the delay, ... [or] any evidence for the plaintiff which could have been presented earlier, the presentation of which was prevented by the delay." Lolatchy, 816 F.2d at 952. Here, Lindemann-Moses would suffer no prejudice if she had to litigate the case, especially where she appears to have previously agreed to settle her claims. Nor does she advance any argument that she would be prejudiced. See MacRegen, Inc. v. Burnette, No. 1:19CV591, 2020 WL 2097631, at *3 (M.D.N.C. May 1, 2020). Therefore, the fourth factor weighs in favor of avoiding or setting aside any entry of default.

As to the fifth factor, the Fourth Circuit generally examines a party's "history of dilatory action" apart from the delay causing the default itself. See, e.g., Colleton Preparatory, 616 F.3d at 418. Here, while CJ was potentially dilatory in his response to Lindemann-Moses's complaint, it is likely because he may never have received actual notice of the lawsuit, which was served by publication in a city where he did not reside. Otherwise, once Lindemann-Moses moved for default, CJ promptly responded. (Doc. 44.) Therefore, this factor weighs in favor of setting aside or avoiding any entry of default.

Finally, as to the sixth factor - the availability of less drastic sanctions - neither party has suggested any. Therefore,

28

this factor counsels in favor of setting aside default.  <u>Pinpoint</u> <u>IT Servs., L.L.C. v. Atlas IT Export Corp.</u>, No. 2:10CV516, 2011 WL 2748685, at *15 (E.D. Va. July 13, 2011) (internal citation omitted).

In sum, considering the totality of the circumstances, the balance weighs in favor of finding "good cause" under Rule 55(c) to set aside any entry of default that might otherwise be entered. The court therefore finds good cause to deny the motion for entry of default.  <u>See</u> <u>Vick v. Wong</u>, 263 F.R.D. 325, 331 (E.D. Va. 2009) ("The Court is required to liberally construe the 'good cause' criteria and resolve all doubts in favor of setting aside default in order to allow the party against whom default has been entered to defend on the merits and avoid the 'extreme sanction' of default.")

Accordingly, Lindemann-Moses's motion for entry of default (Doc. 42) will be denied, and her motion for default judgment (Doc. 41) will be denied as moot.

**III. CONCLUSION**

For the reasons stated, therefore,

IT IS ORDERED that Plaintiff Lindemann-Moses's motion for entry of default (Doc. 42) is DENIED, and her motion for default judgment (Doc. 41) is DENIED as moot.

IT IS FURTHER ORDERED that the Defendant Barbara Jackmon's motion for summary judgment (Doc. 33) is GRANTED as to all claims and that this action against her is DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Defendant Christopher Jackmon's motion for leave to respond to the complaint with a motion for summary judgment (Doc. 44) is GRANTED, and he shall file his requested motion for summary judgment by January 16, 2023.[6] Response deadlines shall apply per the court's local rules.

/s/ Thomas D. Schroeder
United States District Judge

December 8, 2022

---

[6] If CJ elects not to file a motion for summary judgment, he must nevertheless file a proper response to the complaint by that date.